IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BONNIE GARDNER, | |
| Plaintiff, | |
| v. | CIVIL ACTION NO. 12-576 |
| METROPOLITAN LIFE INSURANCE COMPANY, | |
| Defendant. | |

## MEMORANDUM OPINION

**Schmehl, J.**                                                                                                                                             **March 25, 2013**

      Plaintiff, Bonnie Gardner ("Gardner"), brings the instant action to challenge the denial of her claim for disability benefits pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B) against Metropolitan Life Insurance Company ("MetLife"), the insurance company that funded and administered the disability insurance plan provided by her employer. Gardner claims that MetLife's denial of her claim for long term disability benefits was arbitrary and capricious.

      The parties have each moved for summary judgment. Gardner argues that the record supports a diagnosis of dementia and therefore, MetLife's determination that she is not entitled to a continuation of long term disability benefits was incorrect. MetLife maintains that its decision to deny Gardner benefits was not arbitrary and capricious, but based on substantial evidence contained in the record that any cognitive impairments Plaintiff suffered from were due to her chronic fatigue syndrome and not dementia. After a thorough examination of the administrative record and applying a deferential standard

of review, I find that MetLife did not act in an arbitrary and capricious manner when it denied Gardner's disability benefits after it determined the record did not support a diagnosis of dementia. Therefore, I will grant MetLife's motion for summary judgment and deny Gardner's motion for summary judgment.

I.     **BACKGROUND**

Gardner was employed by Siemens Corporation as a systems analyst until March 7, 2008. (Compl. ¶ 6.) Through Siemens, Gardner was covered by a short term and long term disability policy that is both administered and funded by MetLife. (Compl. ¶¶ 7, 12.) Gardner elected "Plan C" of the long term disability ("LTD") Plan which requires MetLife to provide up to 66 2/3 % of her predisability earnings per month, up to a maximum benefit of $16,667. (MET 0013.)

Gardner stopped working due to constant pain, anxiety attacks and fatigue and was placed on short term disability ("STD") pursuant to her STD policy. (Compl. ¶¶ 13-14.) She was eventually diagnosed with anxiety disorder with panic attacks, adjustment disorder with mixed anxiety, depressed mood, fibromyalgia and chronic fatigue syndrome. (Compl. ¶¶ 15, 17.) Gardner received STD benefits from March 10, 2008 through September 5, 2008. (Compl. ¶ 14.) On August 28, 2008, Gardner submitted a claim for LTD benefits. (Compl. ¶ 23, MET 1313-1327.) On January 23, 2009, MetLife denied Gardner's claim for LTD benefits effective September 8, 2008. (Compl. ¶ 24, Ex. B.) Gardner appealed this denial, and on August 21, 2009, MetLife reversed its decision and reinstated Gardner's LTD benefits. (Compl. ¶¶ 25-26, Ex. C.) Gardner then received LTD benefits from September 8, 2008 to September 5, 2010. (MET 0586-0588.) Under the plan in question, Gardner's receipt of LTD benefits was subject to a 24 month

limitation for a disability resulting from "mental or nervous disorder or disease, unless the disability results from schizophrenia, bipolar disorder, dementia or organic brain disease." (Compl, Ex. A, p. 16.) Gardner's plan also provides the same 24 month "Limitation for Disabilities" for "chronic fatigue syndrome and related conditions." (Compl. Ex. A, p. 17.) [1]

On August 16, 2010, MetLife sent Gardner's counsel a letter stating that, as of September 5, 2010, Gardner would have received the maximum benefits available to her under the Plan, as Gardner suffered from a "Mental or Nervous Disorder or Disease," which limited her to 24 months of LTD benefits unless her mental disorder fell under an enumerated exception, which MetLife contended Gardner's did not. (Compl. Ex. E.) On November 29, 2010, MetLife sent Gardner a formal denial of benefits letter. (Compl. Ex. F.)

Gardner appealed her denial to MetLife, claiming that she was entitled to continue receiving LTD benefits beyond the 24 months because she suffered from dementia, which is a specified exception to the 24 month limitation period under the Plan. Gardner based her entitlement to benefits upon the March 10, 2009 report of neurocognitive testing performed by Lawrence Griffin, Ph.D, which diagnosed her with dementia. (Compl. Ex. H.) On August 9, 2011, MetLife informed Gardner that it was upholding its decision to terminate her LTD benefits because the medical information did not support a limited benefit exclusionary diagnosis such as dementia. (Compl. Ex. I.) Gardner filed the instant civil action on February 3, 2012. Gardner contends that MetLife's conclusion that the medical record does not support that she suffers from dementia, a limited benefit

---

[1] On April 20, 2010, Gardner was awarded Social Security Disability benefits, effective October 10, 2008. (MET 0589-0594.) MetLife was entitled to, and did receive, an offset from Gardner due to her receipt of disability benefits. (MET 0794.)

3

exclusionary diagnosis, was unreasonable. For the reasons that follow, I find that MetLife did not act arbitrarily in denying Gardner's claim for LTD benefits.

## II.     ERISA STANDARD OF REVIEW

The denial of benefits under an ERISA qualified plan is reviewed using a deferential standard.  Where the plan administrator has discretion to interpret the plan and to decide whether benefits are payable, the exercise of its fiduciary discretion is judged by an arbitrary and capricious standard.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).  Under this limited and deferential review, MetLife's adverse determination may not be reversed unless it was "without reason, unsupported by substantial evidence or erroneous as a matter of law." Miller v. Am. Airlines, Inc., 632 F.3d 837, 845 (3d Cir. 2011), quoting Abnathya v. Hoffmann-LaRoche, Inc., 2 F.3d 40, 41 (3d Cir. 1993).[2]

In conducting a review under ERISA, courts examine both the structural and procedural aspects of the decision-making.  Miller, 632 F.3d at 845. The structural inquiry examines whether the structure of the plan is such that there is a financial incentive to deny claims. Id.  The procedural inquiry examines how the claim is processed by the administrator to insure a fair and impartial procedure. Id. (citations omitted). The Supreme Court held in Metropolitan Life Ins. Co. v. Glenn, 128 S. Ct. 2343 (2008), that an entity's dual role as claims administrator and insurer creates a structural conflict of interest that "should be weighed as a factor in determining whether there is an abuse of discretion."  Id. at 2350 (quoting Firestone Tire & Rubber, 489 U.S. at 115).

---

[2] Gardner agrees that MetLife's denial of her LTD benefits should be subject to an arbitrary and capricious standard of review.  (See Pl's Brief in support of MSJ at pp. 10-11.) In Gardner's Brief, she states that "where a plan provides the administrator with discretionary authority to interpret the terms of the plan, as the Plan does here, then judicial review is limited to determining whether the administrator abused her discretion." (Id. at 11.)

This financial conflict of interest remains a factor to consider along with other factors in determining whether there has been an abuse of discretion. Ellis v. Hartford Life and Accident Ins. Co., 594 F. Supp.2d 564, 566-67 (E.D. Pa. 2009). Gardner's argument, in reliance on Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 387 (3d Cir. 2000), that MetLife's adverse determination should be reviewed under heightened scrutiny due to MetLife's conflict of interest in administering and funding the Plan is incorrect. The sliding scale analysis set forth in Pinto and previously used by the Third Circuit has been superseded by the "combination-of-factors" test set forth by the Supreme Court in Glenn.

In the instant matter, there is no dispute that MetLife, as insurer for the Plan, both funded and administered the award of disability benefits. Therefore, I shall take this conflict of interest into account as one factor, no more significant than any other factor, in determining whether there has been an abuse of discretion in handling Gardner's claim for LTD benefits.

In reviewing the administrator's processing of Gardner's claim, I must also review procedural factors, as procedural irregularities in the review process cast doubt on the impartiality of the administrator. Miller, 632 F.3d at 845; Post v. Hartford Ins. Co., 501 F.3d 154, 164 (3d Cir. 2007). Gardner argues that MetLife "selectively utilized information favorable to its decision to deny [her] LTD benefits, to the exclusion of evidence which would have required it to grant the benefits at issue." (Pl. Br., p. 12.) While "self-serving selectivity in the use of evidence" is an irregularity that has been identified by courts to warrant enhanced scrutiny, see Lamanna v. Special Agents Mut. Benefits Ass'n, 546 F.Supp.2d 261, 287 (W.D. Pa. 2008), procedural anomalies are but

5

another factor to be considered under the combination-of-factors method. <u>Miller</u>, 632 F.3d at 845, n.2.

### III.   DISCUSSION

Gardner moves for summary judgment, claiming that MetLife's decision to deny her LTD benefits was not reasonable. Defendant MetLife moves for summary judgment by first claiming that Gardner's claim is barred because she has failed to exhaust her administrative remedies. MetLife also argues that it is entitled to summary judgment because its claim determination was reasonable, consistent with the plan language and supported by substantial evidence. For reasons set forth below, I will grant MetLife's Motion for Summary Judgment and deny Gardner's Motion for Summary Judgment.

#### 1.   Exhaustion of Administrative Remedies

MetLife argues that Gardner failed to exhaust all remedies available to her under the Plan, and therefore, she is not permitted to bring an ERISA action in federal court. It is undisputed that administrative exhaustion exists and plaintiffs are required to exhaust all their plan remedies before filing suit in federal court. <u>Metropolitan Life Ins. Co. v. Price</u>, 501 F.3d 271, 280 (3d Cir. 2007).  I find that Gardner properly exhausted her administrative remedies as set forth in the Plan, and therefore, the instant action is properly in federal court.

On August 16, 2010, MetLife sent Gardner a letter informing her that her LTD benefits would be terminated effective September 5, 2010. (MET 0586-0588.) The August 16, 2010 letter advised Gardner that she had 180 days from receipt of that letter to file an administrative appeal to MetLife seeking continued LTD benefits, and that "[i]n

the event [her] appeal [was] denied in whole or in part, [she would] have the right to bring a civil action under Section 502(1) of the Employee retirement Income Security Act of 1974." (MET 0587.) Gardner appeal MetLife's denial of LTD benefits by letter dated April 21, 2011. (MET 0638-0644.)

By letter dated August 9, 2011, MetLife upheld on administrative appeal its original decision to deny Gardner continuing LTD benefits beyond 24 months. (MET 0427-0435.) Like the August 16, 2010, original denial letter, the August 9, 2011 appeal denial letter advised Gardner that she had 180 days to administratively appeal MetLife's decision to affirm its original denial of LTD benefits, and again stated that "[i]n the event [her] appeal [was] denied in whole or in part, [she would] have the right to bring a civil action under Section 502(a) of the Employee Retirement Income Security Act of 1974." (MET 0435.)

The Plan in question allows that if Gardner makes a claim which is denied by MetLife, she has the right to appeal that decision within 180 days. (MET 0042.) MetLife informed Gardner via letter dated August 16, 2010 that it was terminating her LTD benefits, that she had the right to appeal, and that if her appeal was denied, she had the right to bring a civil action. MetLife argues that the language contained in this August 9, 2011, denial letter sets forth a requirement for Gardner to administratively appeal MetLife's second denial to MetLife directly, wait for another decision from MetLife and then bring suit under ERISA. Gardner did not file a second administrative appeal, and instead instituted the instant suit on February 3, 2012.

Based upon the language of the Plan, I find that Gardner properly exhausted her administrative remedies. The Plan required her to file an administrative appeal of an

adverse decision, which she did pursuant to an April 21, 2011 letter, appealing MetLife's August 16, 2010, letter informing her of the termination of her benefits. The Plan then requires MetLife to issue a final decision, which it did pursuant to its August 9, 2011 letter upholding its decision to deny Gardner's benefits. MetLife's August 16, 2010 termination letter clearly instructed Gardner to file an administrative appeal, and also clearly informed her that if she still disagreed with its determination after that administrative appeal, she would then have "the right to bring a civil action." By attempting to include language in its August 9, 2011, denial letter that would force Gardner to appeal its denial a second time, MetLife is attempting to impose additional requirements on Gardner's appeal rights that are not contemplated by the Plan. MetLife does not set forth any authoritative basis in the Plan for requiring a second round of administrative appeals. Furthermore, if including a second appeal requirement in its August 9, 2011 denial imposes additional exhaustion requirements upon Gardner, MetLife could keep Gardner's LTD benefits claim in legal limbo indefinitely by imposing endless rounds of administrative appeals. Accordingly, I find that Gardner has properly exhausted her administrative appeals in this matter.

### 2. Reasonableness of Claims Determination

As stated previously, where an ERISA governed plan grants discretionary authority to the claims administrator to determine eligibility for benefits, as in this case, a court reviewing a benefits determination uses an "arbitrary and capricious" standard of review. Firestone, 489 U.S. at 115. In determining whether a benefits determination is arbitrary and capricious, the court must evaluate whether the determination was

reasonable. Abnathya, 2 F.3d at 45. After a review of the administrative record, I find MetLife's benefits determination was not arbitrary.

In early 2008, Gardner began complaining of constant pain, anxiety attacks, and fatigue. (MET 0998.) When Gardner stopped working at Siemans in March of 2008, her diagnoses were adjustment disorder with anxiety disorder and depressed mood, anxiety disorder with panic attacks, chronic fatigue syndrome, fibromyalgia and hypothyroidism. (MET 1031-32, 1082, 1308.) Gardner's treating physicians also recognized that she had cognitive deficits such as memory and focus issues. (MET 0668, 0677, 0695, 0949, 0973, 1031-1032, 1034-35, 1040, 1068-70, 1108, 1110, 1164, 1171, 2101-02.)

On March 10, 2009, Gardner underwent neurocognitive testing with Lawrence R. Griffin, Ph.D. (MET 0765-0778.) Dr. Griffin found that Gardner suffered from severe depression and anxiety, along with a range of cognitive deficits. (MET 0778.) Dr. Griffin also stated that Gardner "meets the criteria for Dementia. This dementia is NOS [not otherwise specified] but could be related to her physical difficulties." (Id.) Dr. Griffin's diagnoses were major depressive disorder, general anxiety disorder and dementia, NOS. (Id.)

On August 17, 2009, during the initial 24 month period when Gardner received LTD benefits, MetLife had Gardner's medical file reviewed by Gil Lichtschein, M.D., a psychiatrist. Dr. Lichtschein was asked to determine if Gardner's medical information supported psychiatric limitations beyond September 8, 2008. (MET 0904-0905.) After reviewing Gardner's medical records, Dr. Lichtschein found that the records "supported global psychiatric impairment," and "consistently describe[d] the presence of mood and anxiety symptoms [with] consistent complaints of and reporting of cognitive deficits that

9

were significant and likely incapacitating." (MET 0905.) Further, Dr. Lichtschein stated that Dr. Griffin's testing "demonstrate[d] significant cognitive deficits." (Id.) As discussed more thoroughly above, Gardner was then told that her LTD benefits would terminate as of September 6, 2010 pursuant to the Limitation for Disabilities provisions of the Plan. Gardner appealed MetLife's termination of benefits on the basis that she had been diagnosed with dementia, which is a limited benefit exclusionary diagnosis. Thereafter, MetLife had Gardner's file reviewed by two physician consultants: Mark R. Burns, M.D., Board Certified in Rheumatology and Internal Medicine[3], and John R. Shallcross, Psy.D., Board Certifed in Neuropsychology.

In the process of reviewing Gardner's file, Dr. Shallcross spoke with Dr. Griffin on May 18, 2011. Dr. Shallcross summarized his conversation with Dr. Griffin as follows:

> This consultant noted discrepancy between the claimant's premorbid level of functioning, having some college education and performing work as a Systems Analyst and the finding of borderline Full Scale IQ and general memory score at the 1st percentile. [Dr. Griffin] stated that he had recalled this and found it "suspicious" at the time. The doctor stated that he would retrieve the file and call me back after having looked at it. We subsequently attempted to contact each other and left several voicemails. On 5/18/11 at 1 p.m. Eastern Daylight Time, Dr. Griffin left a voice message stating that the scores "seemed valid and there was not a lot of inconsistency." He reported a T-score on the depression scale of the MMPI-2 of 99 and on the Hy scale of 101. Dr. Griffin noted that the profile overall was elevated.

(MET 0537.) Dr. Shallcross also unsuccessfully attempted to speak with Ms. MacQueen, Gardner's therapist. Dr. Shallcross noted:

> Although a number of treaters have noted cognitive impairment, the description of such impairment appears to be both brief and

---

[3] As the instant matter addresses whether Gardner had dementia, a limited benefit exclusionary diagnosis, which is beyond Dr. Burns' expertise as an internist, Dr. Burns' review of Gardner's file will not be discussed.

10

> generic.  There is an absence of mental status evaluation or psychometrics, with the exception of Dr. Griffin's report, by these providers.  It is not apparent whether the cognitive impairment had been directly observed or was the result of self-report from the claimant.  The claimant's therapist, Ms. MacQueen, in a check-the-box form, notes marked impairment in a number of areas but her treatment notes are process oriented and do not support significant impairment of cognition or dementia. The only formal evaluation of the claimant's cognitive condition is the "Psychological Appraisal" conducted by Dr. Griffin in March of 2009. This "appraisal" is not a formal neuropsychological evaluation of the claimant. Only two neuropsychological instruments were administered, an IQ measure and a memory test. Although Dr. Griffin indicates that he had diagnosed dementia on the basis of memory impairment and impairment of executive functioning, there was no measure of executive functioning (such as the Wisconsin Card Sorting Test) administered. Although Dr. Griffin stated that the findings were internally consistent, he acknowledged that the disparity between the claimant's premorbid history and probable IQ and the findings of his evaluation were "suspicious." Despite this, no formal assessment of test taking effort was administered. The only validity scale was found on the personality assessment, the MMPI-2, and Dr. Griffin has acknowledged that this profile was elevated. In fact, the claimant has reported symptoms of psychosis and impaired reality testing as well as extreme elevations on the Hy and the D scales. The doctor has indicated that this could be a "cry for help" but it could equally be a case of symptom exaggeration.

(MET 0539.) Dr. Shallcross further stated that in his opinion:

> dementia or other organic impairment has not been conclusively established for the period of 9/6/10 and beyond. No formal neuropsychological assessment, apart from the two tests given by Dr. Griffin a year and a half earlier, has been conducted. Mental status evaluations are lacking and it is not apparent that the cognitive deficits reported by the various treaters are not a result of claimant's self-report. It is also apparent to this consultant that the very significant discrepancy between level of premorbid functioning and educational and vocational history and the scores achieved on the two instruments administered by Dr. Griffin are at least suspect and that further, more exhaustive, evaluation would be required.

(MET 0539.) When asked to answer the question whether the medical information supported continuous psychiatric functional limitations related to dementia from 9/6/10 and beyond, Dr. Shallcross stated that "[a]part from the two cognitive instruments

11

administered by Dr. Griffin in March 2009, there is little other than probably self-report to support consideration of dementia or organic brain disease beyond 9/6/10. No current neuropsychological evaluation was available and the documentation lacks mental status evaluations, treatment notes, descriptive of observed cognitive impairment, etc. that would support consideration of a diagnosis of this condition." (MET 0540.) Lastly, when asked to comment on why Gardner's medical information does not support a diagnosis of dementia, Dr. Shallcross stated:

> Basically, the only document containing an evaluation of the claimant's neurocognitive status is Dr. Griffin's report from March of 2009. This is a brief "appraisal" and does not constitute a neuropsychological evaluation sufficient for a diagnosis of organic brain disorder and/or dementia. Despite the fact of there being a "suspicious" differential between occupational history, education and likely premorbid functioning and the findings in this evaluation, no test taking effort/validity instruments were administered for memory or the neurocognitive findings. The doctor states that the MMPI-2 profile was elevated which he has attributed to a "cry for help" but could also be an example of symptom exaggeration as several of the scales were grossly elevated.

(MET 0540.)[4]

Dr. Griffin responded to the opinion of Dr. Shallcross on June 17, 2011, stating that the inconsistencies between Gardner's "premorbid level of functioning" and his finding of "borderline Full Scale IQ and general memory score at the 1st percentile" was in fact, "evidence against malingering" and "consistent with dementia." (MET 0463.) Dr. Griffin also stated that "the discrepancy between Ms. Gardner's above average score on Vocabulary and her extremely impaired ability to form memory and to retrieve memory on both the immediate and delayed basis are consistent with dementia. Other than in

---

[4] It is important to note that Dr. Griffin diagnosed Gardner with dementia in March of 2009, during the time that she was receiving LTD benefits, before the 24 month elimination period. After March of 2009, despite much discussion of her cognitive issues, no medical professional had diagnosed Gardner with dementia.

12

dementia, this pattern does not occur." (MET 0464.) Dr. Griffin also refuted the opinion of Dr. Shallcross that Dr. Griffin's testing was "brief" and "generic," stating that the testing was comprehensive, took eight hours and was selected from tests not available publicly in order to provide an accurate diagnosis. (MET 0460-0461) Dr. Griffin also disagreed with the statement of Dr. Shallcross that it could not be determined whether the cognitive impairments in question were directly observed or resulted from Gardner's self-reporting, stating that Gardner's self-reported impairments were consistent with the results of his interviews and testing. (MET 0465-0466.)

Dr. Shallcross then responded to Dr. Griffin's response on July 22, 2011, stating that his concern with Dr. Griffin's diagnosis of dementia was "that Dr. Griffin has not established the validity of the claimant's test taking performance and the extreme decline from pre-morbid functioning as a Systems Analyst to an individual with an IQ of 76 and Memory Index scores in the 0.03-6th percentile is not credible without an established etiology and concurrent observations," as "[t]here are suggestions of cognitive impairment noted by other treaters (without evaluation), but nothing appears in the documentation to suggest that the claimant was impaired to the degree indicated by Dr. Griffin's test findings." (MET 0447.)[5]

After a review of the information contained in Gardner's file, including her medical records, the opinions of her treating and evaluating physicians and the reports of the physician consultants such as Dr. Shallcross, MetLife determined that the medical

---

[5] As discussed previously, an ALJ with the Social Security Administration found Gardner to be disabled and granted her application for social security disability benefits. (MET 0589-0594.) The ALJ found that Gardner had severe impairments in the nature of fibromyalgia, chronic fatigue syndrome and mood disorder. (MET 0591.) Dr. Shallcross reviewed the decision of the ALJ and found that it did not change his opinion. (MET 0551.) Specifically, Dr. Shallcross found that the ALJ's decision did not support functional limitations from a psychological/neurocognitive perspective. (MET 0551.)

13

information did not support a limited benefit exclusionary diagnosis such as dementia or organic brain disease. Specifically, pursuant to a letter dated August 9, 2011, MetLife advised Gardner as follows:

> In completing our appeal review, we have determined that although Ms. Gardner has medical conditions that you feel rendered her incapable of working as of September 6, 2010 and meet the criteria for a limited benefit exclusion diagnosis, the clinical medical evidence contained in Ms. Gardner's claim file does not support a limited benefit exclusionary diagnosis, either mentally or physically. The medical records do not support a severity of any condition that would preclude Ms. Gardner from performing her own sedentary occupation as of September 6, 2010.
>
> Benefits must be administered in accordance with the employer's plan and that requires that the disability be defined and medically substantiated on a continuous basis by [Gardner's] provider with comprehensive and specific medical information.
>
> Based on our review there is no clinical medical data supporting a limited benefit exclusionary diagnosis such as schizophrenia, bipolar disorder, dementia, organic brain disease, seropositive arthritis, spinal tumors, malignancy, vascular malformations, radiculopathies, myelopathies, traumatic spinal cord necrosis, or musculopathies as defined by the Plan.

(MET 0434.) Thereafter, Gardner filed the instant action.

The issue before me is whether, based on the record as discussed above, there was substantial evidence from which MetLife could have reasonably concluded that Gardner did not suffer from dementia and therefore, did not meet the criteria for a limited benefit exclusionary diagnosis under the Plan. MetLife concluded that there was no medical evidence supporting a diagnosis of dementia. Therefore, I must consider the evidence that MetLife relied upon in reaching this conclusion in order to determine if it acted arbitrarily. I have carefully scrutinized the record for potential procedural abnormalities.

Because MetLife relied on the opinion of Dr. Shallcross, a hired consultant, I must examine how MetLife viewed the conclusion of Dr. Shallcross in comparison with

those of Gardner's treating and/or evaluating physicians. If MetLife gave undue deference to the opinion of Dr. Shallcross, a consultant who never examined Gardner, or gave his opinion substantially more weight than the conclusion of Gardner's treating and/or evaluating physicians without a sufficient basis, a procedural anomaly arises. Kosiba v. Merck & Co., 384 F.3d 58, 67-68 (3d Cir. 2004). If the opinion of Dr. Shallcross is not founded on reliable evidence, it will not be given conclusive effect. Addis v. Ltd. Long-Term Disability Program, 425 F.Supp.2d 610, 617 (E.D. Pa. 2006).

MetLife's determination that Gardner does not suffer from dementia so as to qualify for continuing LTD benefits is supported by substantial evidence of record. First, based on the records of Plaintiff's treating physicians and therapists, Dr. Griffin's diagnosis of dementia is unsupported. A review of the records of Gardner's treating physicians and therapists shows that they made numerous notes regarding her cognitive issues, such as memory issues and forgetfulness. (MET 0668, 0695, 0949, 0973, 1068-1069, 1108, 1110.) Susan Levine, M.D., began treating Gardner in October of 2008. Dr. Levine's records document Gardner's complaints of fatigue, malaise, headaches, sore throats and cognitive dysfunction, including short term memory loss and diminished concentration. (MET 1171, 1201, 1168, 1164, 1163.) On August 5, 2009, Dr. Levine stated that Gardner "had been experiencing daily complaints of malaise, headaches, sleep problems and cognitive dysfunction. These symptoms are part of the symptom complex of CFS (chronic fatigue syndrome)." (MET 0973.)

On June 15, 2011, in response to Dr. Shallcross' report, Gardner's therapist, Ms. MacQueen, wrote to MetLife, stating that anxiety and panic attacks can affect cognitive functioning, and noted Gardner's "cognitive and memory functioning were limited."

(MET 0456-0457.) However, Ms. MacQueen also stated that she did not "have the education or accreditation to assess physical or medical diagnosis." (MET 0456.)

Both Gardner's treating physicians and Ms. MacQueen, her therapist, made numerous references to Gardner's cognitive impairments; however, none of these treaters linked her cognitive issues to dementia.  To the contrary, Dr. Levine specifically linked Gardner's cognitive problems to her CFS and fibromyalgia. From 2008 to 2011, none of Gardner's treaters made any reference to the possibility that Gardner's cognitive issues could be related to dementia.

Further, MetLife had Griffin's diagnosis of dementia reviewed by a neuropsychologist, Dr. Shallcross. Upon reviewing Dr. Griffin's report and speaking with Dr. Griffin personally, Dr. Shallcross found that Dr. Griffin's report was "brief and generic" and that the medical records did not establish that Dr. Griffin actually observed Gardner's cognitive impairments and that his opinion was not just based upon her self-reporting.  Dr. Shallcross also noted an "absence of mental status evaluations or psychometrics with the exception of Dr. Griffin's report, which was not a formal neuropsychological evaluation." Dr. Shallcross expressed further concern that although Dr. Griffin stated that he had diagnosed dementia on the basis of "memory impairment and impairment in executive functioning," there was no measure of executive functioning such as the Wisconsin Card Sorting Test.  Further, Dr. Shallcross pointed out that Dr. Griffin did not perform a formal assessment of Gardner's test taking effort, despite acknowledging that the disparity between Gardner's premorbid history and the findings of the evaluation to be suspicious. After his thorough review of Gardner's file and his

conversation with Dr. Griffin, Dr. Shallcross concluded that "dementia or other organic impairment has not been conclusively established" from September 6, 2010 and beyond.

Dr. Griffin was given an opportunity to address the issues that Dr. Shallcross presented with his report. Upon review of the additional information Dr. Griffin provided in an attempt to refute the issues that Dr. Shallcross found with his opinion, Dr. Shallcross still found that the documentation contained in Gardner's file did "not support functional limitations from a psychological/neurological perspective." In his final opinion, Dr. Shallcross again opined that Dr. Griffin's testing was "brief, narrow in scope, lacks adequate validity measures, and fails to question a very significant discrepancy between premorbid and current functioning. . ."

As discussed above, both Gardner's therapist, Ms. MacQueen and her treating physician, Dr. Levine, attributed Gardner's cognitive deficits to her CFS and fibromyalgia. No one other than Dr. Griffin, a one-time, non-treating evaluator, ever made a link between Gardner's cognitive issues and dementia. MetLife found that the opinion of Dr. Griffin, which was called into question by Dr. Shallcross, was insufficient to establish a diagnosis of dementia. MetLife chose to credit Dr. Shallcross' opinion and the opinions of Gardner's other treaters who found her cognitive deficits to be related to CFS over the opinion of the one-time evaluator, Dr. Griffin. There is no evidence that MetLife ignored the opinion of Dr. Griffin, or refused to credit it. The issues raised by Dr. Shallcross regarding the deficiencies in Dr. Griffin's report presented a disagreement among medical professionals, which "does not amount to an arbitrary refusal to credit." Statton v. Dupont De Nemours & Co., 363 F.3d 250, 258 (3d Cir. 2004). Nor did MetLife give undue deference to the opinion of Dr. Shallcross without a sufficient basis. As

17

MetLife did not refuse to credit Dr. Griffin's opinion, but instead chose to rely on the opinion of Dr. Shallcross over the opinion of Dr. Griffin, this action is not unreasonable. Dr. Shallcross was Board Certified in Neuropsychology and was well qualified to address the issues in Dr. Griffin's opinion regarding Gardner's alleged dementia. Further, Dr. Shallcross went to great lengths to effectively set forth the problems he found with Dr. Griffin's opinion regarding Gardner's alleged dementia. Clearly, Dr. Shallcross' opinion was founded on reliable evidence and should be given conclusive effect. I find that MetLife did not selectively utilize evidence. To the contrary, it weighed all relevant evidence at its disposal and gave conclusive effect to the opinion of Dr. Shallcross rather than the opinion of Dr. Griffin.

Gardner frequently mentions the fact that her treating providers, as well as Dr. Lichtenstein and Dr. Shallcross, MetLife consultants, found that she suffers from cognitive deficits. However, the issue in this case is not whether Gardner has cognitive deficits. Rather, the issue is whether Gardner is disabled as a result of dementia in order to be entitled to continuing LTD benefits beyond the 24 month period. Other than Dr. Griffin in 2009, over 18 months before the September 2010 end of the limitation period, no treater or evaluator had diagnosed Gardner with dementia. Gardner never received any treatment for dementia. No physician ever treated Gardner for dementia after Dr. Griffin's March of 2009 opinion. When presented with conflicting reports from Dr. Griffin and Dr. Shallcross, MetLife was not arbitrary and capricious in crediting the opinions of Dr. Shallcross over Dr. Griffin. It has been stated that "if [a] consultant's conflicting opinion is based on reliable evidence, it can support a determination contrary to that of a treating physician." Addis v. Limited Long-Term Disability Program, 425

F.Supp.2d 610, 617 (E.D. Pa. 2006). As Dr. Shallcross' opinion that Gardner does not suffer from dementia is based upon reliable evidence contained in the administrative record, it is properly used to support a determination contrary to that of Dr. Griffin, an evaluating physician.

MetLife's determination that Gardner did not suffer from dementia was reasonable because it was based on the opinion of a qualified professional with support from the medical records of her treating physicians.  Therefore, MetLife's decision not to extend her LTD benefits past the 24 month elimination period under the Plan was not arbitrary and capricious.

## IV.     CONCLUSION

The record supports the finding that, as defined in the Plan and reasonably interpreted by MetLife, Gardner did not suffer from disabling dementia. MetLife's conclusions were not arbitrary and capricious. Therefore, the Motion for Summary Judgment of MetLife is granted and the Motion for Summary Judgment of Plaintiff, Bonnie Gardner, is denied.